UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| EVERETT J. PRESCOTT, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CV-05-88-B-W |
| | ) | |
| RICHARD D. ROSS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

Richard D. Ross, a highly successful and well liked salesman for Everett J. Prescott, Inc., a pipe and valve distributor, violated a non-competition and non-disclosure agreement by terminating his employment and hiring on as a salesman with a direct competitor. This Court concludes that Everett J. Prescott, Inc. is entitled to a preliminary injunction, preventing Mr. Ross from continuing to violate the terms of his agreement.

**I.    STATEMENT OF FACTS**

**A.  Procedural History**

On June 2, 2005, Plaintiff Everett J. Prescott Inc. (EJP) filed a Complaint in state of Maine Superior Court against Defendant, Richard D. Ross, seeking injunctive relief and damages for an alleged violation of a Non-Competition and Non-Disclosure Agreement. With the Complaint, EJP filed a Motion for Temporary Restraining Order and/or Preliminary Injunction. After the Superior Court granted a TRO on June 6, 2005 for a period of three years, and denied Mr. Ross's Motion to Dissolve, Mr. Ross removed the case to this Court on June 16, 2005. Upon removal, the Court held a two day hearing on July 8 and 13, 2005.

**B.  Background**

### 1. The Pipe and Valve Distribution Business and Richard D. Ross

Richard J. Ross is an engaging, but tightly wound salesman. Now forty-two years old and living in southern New Hampshire with his wife Suzanne and their nine year old son, Mr. Ross dropped out of Northeastern University in 1982 and joined O'Connell Pipe and Supply in Everett, Massachusetts. Although he did not realize it at the time, he had chosen his career. On January 11, 1986, after working for O'Connell for four years, Mr. Ross was hired by Water Works (WW), a Malden, Massachusetts company. Beginning first on the counter, he gradually worked into sales. He left WW in 1994 to join EJP.

For the next eleven years, Richard Ross worked as an outside salesman for EJP in their Middleton, Massachusetts office, selling pipe, valves, and fittings to various contractors in northeastern Massachusetts. EJP is one of the region's largest water, sewer, and drain pipe distributors, with headquarters in Gardiner, Maine, and offices throughout New England and the Midwest. It has two hundred and thirty employees in twenty six locations. Mr. Ross's sales territory was the northeast quadrant of Massachusetts, including Boston, as far west as Fitchburg, and as far north as the New Hampshire border. As part of his job, he reviewed construction plans, determined the water, sewer and drainpipe materials required to complete a project, and calculated bid prices. By all accounts, he has been a highly successful, highly compensated salesman for EJP, well liked by the company and its customers.

### 2. Multipliers and Competitive Bidding:   The Pipe, Sewer, and Valve Distribution Business

The pipe and valve distribution business is a world unto itself. As in many businesses, vendors sell to distributors, which in turn sell to customers. However, as described by EJP, the pricing practices in the pipe and valve distribution business are reminiscent of a North African

casbah:  all prices are negotiable.  Prices for the same item vary depending on who is selling, who is buying, what is being sold, the project being built, the distributor, and a host of other factors.

The pipe and valve distribution business is fiercely competitive.[1]  Numerous distributors sell essentially the same products and deal with essentially the same vendors and customers.  The vast bulk of projects is placed out to public bid and by law typically must go to the low bidder and, therefore, the cost of EJP products can make the difference on whether its customers (and who among its customers) will be successful in the bidding process.

To learn what projects are up for bid, employees at EJP and other distributors pour over references such as New England Construction News.  Also, people in outside sales physically chase jobs down, making cold calls to engineering firms and contractors, and attending bid openings.  Once they get wind of a job, they proceed to the project engineer, obtain a set of plans, and translate those plans into product, performing a "take-off" in the cant of the business. This process requires detailed, practical knowledge and is usually performed initially by people in inside sales, but is run by outside sales for a "last look."  Once the product is defined, priced and packaged, EJP contacts and is contacted by contractors, who will compare the EJP package against other distributors and will select one upon which to base their bids.

If the bid is successful, EJP prides itself on service to the contractor during construction. The construction business is schedule driven; each segment depends on a synchronized completion of other segments.  If the proper pipe is not available, this can hold up the electrician and, as they wait, money flows and is wasted.  EJP employees would routinely visit the site, help solve construction problems, ride herd on product delivery, and give out expert product information.  Whether a contractor accepts the EJP package depends on innumerable factors.

---

[1] "Pipe and valve" is shorthand for a much more varied array of products, ranging from fittings to fire hydrants.

3

Price is invariably the most important, but service, long term business relationships, personal friendships, and other subtleties come into play.

Having worked his whole adult life in the pipe and valve business, Mr. Ross carries an impressive set of assets to his job.  He has worked the counter and knows the product; he has worked in inside sales, analyzing plans, doing take-offs, pricing, and packaging; he has worked in outside sales; and, he has an engaging personality.   But, Mr. Ross brings an unusual mathematical capacity particularly advantageous to this line of work:  he can do the multipliers in his head.

As Steven Zanni, the Middleton Office Division Manager for EJP, explained it:  five different customers get five different prices for the same product and the bottom line is that EJP charges what the market will bear.  Out of a universe of about four hundred customers, two hundred and fifty are active, and EJP has about thirty to forty core customers.  The customer's price depends upon such factors as how big the customer is, how big the order is, how quickly the customer pays, how much it shops around, how important the quote is, the nature of the materials being ordered, and the location of the job.  If a customer, even a regular customer, does not quibble, it will get a high quote.   If a customer negotiates, it will likely get a lower, negotiated price.  If the customer is slow in paying, it will get a higher price, even if it attempts to negotiate.  Even within a package, there may be high and low prices for different products, allowing the customer to make a competitive bid, but at the same time, allowing EJP to make a substantial profit on less significant items.   EJP attributes a large portion of its success to knowing its customers:  differentiating those who quibble from those who don't, those who shop on every item from those who don't, and further from those who shop only certain selected items.

It is the other side of the business, however, where multipliers come in.  EJP gets its products from vendors.  EJP applies a "multiplier" to the vendor's price, reducing the vendor's listed price for each product.  For example, if the list price were $100.00 for a valve and the multiplier were .4, the discount for the valve for EJP from this vendor would be $40.00.  Each vendor has different multipliers and the multipliers are changed periodically, sometimes annually, bi-annually, or every three years.  As with the customer discounts, the vendor discounts depend on a similar cascade of factors, the amount of business EJP does with the vendor being the most important.  EJP separately negotiates the multipliers with each vendor and one vendor does not know whether another vendor has agreed to a multiplier or what the other vendor's multiplier may be.  The same vendor will have different multipliers on approximately thirty different categories of products.

The multipliers are highly confidential.  EJP does not want its vendors to know that other vendors have been stingier or more lax in their negotiated multipliers and it also does not want its customers to know the details of its vendor multipliers.  The contractor who thinks it got an excellent price from EJP may have, in fact, received a higher profit markup than it would have any reason to suspect.  Moreover, EJP does not reveal its multipliers to its competition.  Vendors would be chagrined if the favorable multipliers for EJP were shared with other distributors to whom they have been less generous.

Price negotiations continue up to the bid submission.  Once a contractor gets a package from EJP, it will commonly get a competitive package from other distributors.  Contractors routinely call distributors to test market resistance and, in turn, outside sales will negotiate with the vendors to press the price.  Vendor reaction depends on the ultimate customer, whether they are likely to end up with the order, and the impact on their business relationship with EJP.

Negotiations are fast paced.  Contractors need to know quickly what prices they can plug into their bids.  Mr. Ross's cell phone was constantly ringing with inquiries and he apparently possesses an uncommon ability to react instantaneously:  to calculate the multiplier for different vendors and different products in his head and to recite product quotes.  This, together with his other qualities, has made Richard Ross an especially valuable and valued employee.

### 3.   December 2004:  Richard Ross's Discontent

In December, 2004, Mr. Ross, who has been diagnosed with multiple sclerosis, decided the pressures of his job at EJP were taking a toll on his health and family life.  He contacted WW, his earlier employer, and was offered a job.  He accepted a sales position with WW, but was heavily recruited by EJP's top managers to stay with the company.  After EJP addressed some of his concerns, including hiring more support staff and significantly increasing his salary, Mr. Ross remained with EJP.

Although Mr. Ross stayed with EJP, his problems persisted.  Mr. Ross testified at some length and with considerable emotion about the sources of his troubles at EJP, but he found it difficult to be precise.  He described a culture of corporate pride at EJP.  Mr. Ross said EJP was "the biggest and the best," the "King of the Hill," and the "premier supplier in the northeast."  At the same time, he felt under overwhelming pressure to produce.  The sources of this pressure, whether imposed upon him, self-imposed, or a combination of the two, are difficult to discern and beside the point.  But, when EJP gave him a $15,000.00 raise in December, 2004, instead of boosting his confidence in EJP's commitment to him, it only exacerbated his stress by ratcheting up his production expectations.  Percolating under his dissatisfaction was the sense that EJP was his only option.  He said he was informed in no uncertain terms that if he left, EJP would see to it

he would not be successful; in Steven Prescott's memorable and direct words, "we can crush you."

### 4. March 14-15, 2005:  EJP Presents and Mr. Ross Signs A Non-Competition and Non-Disclosure Agreement

In March, 2005, EJP reinstituted a policy requiring key employees, including outside salespeople, to enter into a non-competition agreement.  Although EJP at one point had required its outside salespeople to sign non-competition agreements, Mr. Ross had never signed one.  On March 15, 2005, Mr. Zanni and Robbie Chadwick, another EJP supervisor, gathered Mr. Ross and Rick Stone, the other Middleton outside salesperson, into a conference room and told them about EJP's new policy.  Mr. Zanni explained that EJP had decided to protect itself by requiring certain key employees to sign non-competition agreements.  He presented them with a six page agreement and said they would receive an extra $250.00 for signing.  Mr. Zanni related a story about a New York employee, who refused to sign and had been summarily terminated; Mr. Zanni said this employee's new employer ended up paying damages to EJP.  He suggested their continued employment was at risk if they did not sign.   Mr. Stone immediately signed the agreement and left the room.

Mr. Ross testified that the minute he saw the non-competition agreement, he became extremely nervous and felt his heart race.  After Mr. Stone had signed the document, Mr. Ross felt compelled to sign it and he did.  However, immediately after signing it and handing it to Mr. Zanni, he grabbed it back, and asked if he could talk to his wife.  Mr. Chadwick asked him what the trouble was, since he had signed a non-competition agreement when he was hired.  Mr. Zanni said:  "No, he didn't."  They let him leave the room to call his wife.

Suzanne Ross is, according to Mr. Ross, his "backbone." When he called her, she immediately reacted by saying: "You didn't sign it, did you?" When he admitted he had signed the document, she told him to scratch his name off the agreement and said "if you sign it, don't come home tonight." She instructed him to return that evening with the unsigned agreement in hand. Mr. Ross returned to the conference room and asked for some time to consult their attorney and think about it. Mr. Zanni asked him how long he needed, and Mr. Ross replied one day. Mr. Zanni informed him that he needed an answer within twenty-four hours and imposed a deadline of 11:00 a.m., March 16, 2005.

That night, Mr. Ross discussed the non-competition agreement with Mrs. Ross, but did not have a chance to discuss it with their attorney. When he arrived at work the next morning, he was immediately confronted by Mr. Zanni, who demanded: "Do you have it?" When Mr. Ross played dumb, Mr. Zanni let him know in unmistakable terms that he expected the signed agreement, as promised, by 11:00 a.m. Mr. Ross called Mrs. Ross, who was faxing the agreement to their lawyer. Their lawyer, however, was in court and unavailable until after 11:00.

Mr. Ross proceeded to Mr. Zanni's office. He was not sure whether he asked for additional time, but in any event, Mr. Zanni handed him a fresh copy of the agreement and Mr. Ross said: "I have no choice. I work for the Prescotts. I have to sign." Mrs. Ross had told him that if he did not accept the $250.00, the agreement was unenforceable. He, therefore, inscribed beside his signature: "Do not want $250.00." What ensued over the next few days was a series of moves whereby EJP tried to get Mr. Ross to cash a $250.00 check while Mr. Ross steadfastly refused to do so.

### 5. Late March – June 10, 2005:  Mr. Ross Leaves EJP and Rejoins Water Works

Shortly after signing, Mr. Ross decided to leave EJP and return to WW. He gave notice in April 2005, but EJP convinced him to stay for another month and he left on May 20, 2005. During this one month, EJP made strenuous efforts to convince him to remain with the company. Mr. Ross was contributing as much as $9,000.00 per year toward his medical insurance and at one point, Mr. Zanni asked him whether he would stay, if EJP paid this cost. Mr. Ross rejected this proposal, saying: "It's time for Ricky Ross to move on." Within days of starting his new job at WW, he left his new contact information with several former customers of EJP. While at WW, he made at least one sale to a former EJP customer, the DeFelice Company. On June 10, 2005 he was served with a Temporary Restraining Order issued by the Maine Superior Court, and has not worked since.

### 6.  Water Works:  A Different Business Model

At the July 8, 2005 hearing, Mr. Ross called Damon Moore, the President and Owner of WW, a company Mr. Moore inherited from his father. WW has thirty-four full time employees and four part-timers. Mr. Moore said that WW and EJP are "basically in the same business on different scales." He listed a string of customers, many of whom were also EJP customers. EJP extends from Maine to Indiana, while WW concentrates in northeast Massachusetts and southern New Hampshire. WW is able to compete with its larger competitor, EJP, by concentrating on niche work; in Mr. Moore's words, "the more complicated the better." Further, WW specializes in restraint joint system jobs.

Mr. Moore appeared nonplussed by EJP's description of multipliers, customer discounts, and competitive markups. He denied that WW has any preferential pricing relations with its vendors and he thought WW and EJP receive the same price for the same product from the same vendors. He gives few, if any, discounts to his customers, regardless of the volume of sales or

other factors.  He stated that even if he knew what his competitors, including EJP, were charging, it would not affect his business practices at all.  By contrast with the descriptions of EJP, WW's business model seemed old fashioned, personal, almost quaint.

He said he hired Mr. Ross purely for his personal qualities.  WW had employed him in the past and knew him to be a quick learner and personable.  He denied receiving EJP documents from Mr. Ross and further denied that WW would benefit from any information Mr. Ross brought from EJP.  He explained that EJP information would be stale and, based on his business model, of little use.  He was contemplating  using Mr. Ross to expand WW's operations into southern New Hampshire.

### 7.    The Non-Competition and Non-Disclosure Agreement

The Non-Competition and Non-Disclosure Agreement provides that Mr. Ross will not compete with EJP or disclose any proprietary or confidential information.  The "Covenant Not to Compete" states:

> Employee will not during the term of this Agreement, directly or indirectly, personally or as a principal, agent, stockholder, director, officer, investor, employee, consultant or counselor or in any other capacity in or on behalf of any entity whatsoever, corporate, individual or otherwise, provide or offer to provide services competitive with or similar to those provided by Employer in the Covered Geographic area.

*Agreement* at 2.  The "Covenant Not to Disclose" states:

> Employee understands and agrees that all Proprietary Information and Confidential Information is the property of Company, is valuable to Company, and that Employee has no property interest in it.  Employee agrees that both during the term of this Agreement and at all times thereafter, Employee will not, without prior written authorization from Company: (i) disclose, permit access to, publish or otherwise make available any Proprietary Information or Confidential Information to any person or entity; or (ii) use any Proprietary Information or Confidential Information for any purpose other than as required to perform Employee's duties to Company.

10

*Id.* at 2-3.  "Proprietary Information" is broadly defined to include "trade secrets, client lists, and other confidential and proprietary information, financial and pricing information, marketing and sales information…."  *Id.* at 2.  "Confidential Information" is defined "to mean information pertaining to customers, vendors, or other business affiliates of Company."  *Id.*  The term of the agreement is "the entire time that Employee is employed by Company and three (3) years after the termination of employment…"  *Id.*  The Agreement also contains a definition of "Covered Geographic Area," which includes "the geographical area within a one hundred (100) mile radius of each of the offices, distribution centers, and any other place of business of the Company."  *Id.*

The Agreement has a remedy provision.  It states that in the event of a breach of this agreement, "Company shall be entitled to an injunction restraining Employee from such breach and from rendering any services to any person, firm, or entity in breach of this Agreement."  *Id.* at 4.  It also provides for liquidated damages in an amount "equal to the greater of the amount paid to or earned by Employee during the time that Employee was in breach… or the amount of revenue lost by Company…."  *Id.*  It requires the employee to reimburse EJP for its reasonable attorney's fees and out of pocket expenses incurred in enforcing the agreement.  *Id.*  The Agreement provides that it is to be interpreted in accordance with the law of the state of Maine.  *Id.* at 5.

### 8.  EJP's Request for Injunctive Relief

In its original motion for preliminary injunctive relief, EJP requested that the court enforce the terms of the non-competition agreement, and enjoin Mr. Ross from:

1) Continuing in employment from WW or any other business in direct competition with EJP within a 100 mile radius of EJP's distribution centers;

2) From contacting, soliciting, or in any way conducting any business with any customers of EJP that were customers of EJP while Mr. Ross was employed by the company for a period of three years; and,

3) From disclosing any proprietary or confidential information, at anytime without written authorization from EJP.

*Pl.'s Motion for Temporary Restraining Order and/or Preliminary Injunction* at 1-2. At the close of the evidentiary hearing, counsel for EJP clarified it was not seeking to enforce the 100 mile geographic limitation.

## II.   DISCUSSION

### A.  Preliminary Injunction Standards

EJP's Motion for Preliminary Injunction rests on two theories: (1) Mr. Ross's breach of the Non-Competition and Non-Disclosure Agreement ("the Agreement"); and, (2) a violation of the Maine Uniform Trade Secrets Act (MUTSA).

As the party moving for preliminary injunction, EJP bears the burden of satisfying each element of a familiar four-part test: (1) it must be likely to succeed on the merits; (2) it must suffer from immediate irreparable injury without injunctive relief; (3) it must balance the equities, *i.e.* the harm to the plaintiff in the absence of an injunction must exceed the harm to the defendant if the injunction is granted; and, (4) the public interest must be better served by granting the injunction than by denying it. *Matos v. Clinton Sch. Dist.,* 367 F.3d 68, 73 (1st Cir. 2004); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir. 1996); *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir. 1991); *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.,* 2003 ME 140, ¶ 9, 837 A.2d 129, 132. The Court must "bear constantly in mind that an 'injunction is an equitable remedy which should not be lightly

indulged in, but used sparingly and only in a clear and plain case.'"  *Saco Defense System Div., Maremont Corp. v. Weinberger*, 606 F. Supp. 446, 450 (D. Me. 1985) (quoting *Plain Dealer Publishing Co. v. Cleveland Type. Union # 53,* 520 F.2d 1220, 1230 (6th Cir. 1975), *cert. denied,* 428 U.S. 909 (1977)).

## B.  Likelihood of Success on Merits

Although all four parts of the preliminary injunction test must be satisfied, the "likelihood of success is the touchstone of the preliminary injunction inquiry."  *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998).  Indeed, the likelihood of success on the merits is "the sine qua non of this four-part inquiry," with the remaining factors only "matters of idle curiosity" if the moving party cannot demonstrate that he is likely to succeed with his claim.  *Rencor Controls v. Stinson*, 230 F. Supp. 2d 99, 102 (D. Me. 2002) (citing *New Comm Wireless Servs. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

### 1.  Breach of the Agreement

If the non-competition agreement is enforceable, it is beyond argument that Mr. Ross breached it.  He left employment with EJP, hired on with one of its competitors in his former sales region, and actively solicited former customers.  At least one EJP customers, DeFelice, purchased product from WW through Mr. Ross's efforts, in the brief interval he was re-employed at WW.  The resolution of this issue, therefore, hinges not on whether the agreement was breached, but whether it is enforceable.

### 2.  Duress

Mr. Ross argues he signed the agreement under duress.[2]  Maine has not yet adopted the doctrine of economic duress or business compulsion.  *City of Portland v. Gemini Concerts, Inc.*,

---

[2] Mr. Ross does not argue this is an unenforceable contract of adhesion.  If he had, this argument would have been equally unavailing.  *See Wausau Mosinee Paper Corp. v. Magda,* 366 F. Supp. 2d 212, 221 (D. Me. 2005); *Schroeder v. Rynal, Ltd.,* 1998 ME 259, ¶ 15, 720 A.2d 1164, 1167.

481 A.2d 180, 183 (Me. 1984)("Assuming, without deciding, that the doctrine is viable in this State…."); *see Veilleux v. Fulmer*, Civ. No. 99-0148-B, 2000 U.S. Dist. LEXIS 8748, at ¶ 5, n 3 (D. Me. Jun. 19, 2000); *Acoustic Energy Corp. v. Spencer,* No. CV-01-372002, Me. Super. LEXIS 218, at * 6-7 (Me. Super. Ct., Han. Cty., Nov. 12, 2002) (Hjelm, J.) (Plaintiff's communication of its intention to terminate its performance "cannot be viewed as contractual duress, even if such a doctrine is good law in Maine.").   Nevertheless, Maine courts have generally analyzed economic duress claims as if Maine would adopt the doctrine and, once adopted, it would "resemble the doctrine as it has developed in other states within this Circuit." *Veilleux,* ¶ 5 n.3.

Gemini Concerts traced the origin of the doctrine to early common law where two classes of duress were recognized:  (1) duress by unlawful imprisonment; or, (2) threats of loss of life or limb, mayhem or unlawful imprisonment.  *Gemini Concerts,* 481 A.2d at 182.  The doctrine has been broadened over the years, but it still requires "wrongful acts or threats which subvert the will of the threatened party."  *Id.* at 183.  Actions "that are not wrongful cannot result in duress." *Id.*  There can be no rescission merely upon the grounds of "driving a hard bargain." *Id.*

Here, EJP's actions fall far short of demonstrating economic duress or business compulsion. Except in rare cases, the bargaining power of the employer eclipses the bargaining power of the individual employee.  But, here, Mr. Ross was in an unusually strong position.  He had recently obtained employment elsewhere and EJP had wooed him back.[3]  The bargaining power between EJP and Mr. Ross was not one-sided when he signed the agreement.  To the contrary, even after he announced his intention to leave, EJP did its utmost, albeit unsuccessfully, to convince him to remain.  EJP's insistence that Mr. Ross sign the agreement

---

[3] In fact, within just a few weeks of signing the non-competition agreement, Mr. Ross was able to obtain other employment.

and its imposition of a time deadline are not the types of improper threats the law requires to void a contract. *See Restatement (Second) of Contracts* §§ 175-76 (1981).

### 3.   The Enforceability of the Non-Competition Agreement

Under Maine law, non-competition agreements are "contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." *Lord v. Lord*, 454 A.2d 830, 834 (Me. 1983).  Whether a non-competition agreement is reasonable "is a question of law to be determined by the court." *Chapman & Drake v. Harrington*, 545 A.2d 645, 647 (Me. 1988) (citations omitted).  The reasonableness of a specific covenant must ultimately be determined by the facts developed in each case as to its duration, geographic area and the interests sought to be protected. *Id.*; *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995).  Courts assess a non-competition agreement as the employer "has sought to apply it and not as it might have been enforced on its terms." *Brignull*, 666 A.2d at 84.

Mr. Ross attacks the non-competition agreement on a number of fronts.  First, he argues that the agreement does not protect a legitimate business interest of the employer.  The Maine Law Court has commented that "protecting an employer from business competition is not a legitimate business interest to be advanced by (a non-competition agreement)." *Id.*  However, a covenant not to compete may be reasonable "when the employee during his term of employment has had substantial contact with his employer's confidential information, including customer lists, and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business." *Chapman & Drake,* 545 A.2d at 647 (citations omitted).  In such a situation, an employer may "prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment

and from enticing away old customers . . . ."  *Bernier v. Merrill Air Eng'rs*, 2001 ME 17, ¶ 15, 770 A.2d 97, 103 (quoting *Roy v. Bolduc,* 34 A.2d 479, 480-81 (Me. 1943)).

There is overwhelming evidence, however, that EJP's non-competition and non-disclosure agreement protects the type of business interest sanctioned by Maine law.  For eleven years, Mr. Ross had engaged in outside sales for EJP.  He had eleven years of direct personal contact with EJP customers.  He can distinguish between EJP's core and occasional customers, between those who negotiate for price and those who do not, between the quick and slow pays.  Moreover, because he is so retentive, he is not only aware of EJP's practices regarding multipliers, but also he can presumably use this information to undercut EJP.  For example, with his knowledge, he could inform EJP's core customers, unaware of the multiplier effect, that EJP has treated them less generously over the years than their competitors.  He could also affect EJP's relationships with the vendors, who have extended multipliers on the assumption they will remain confidential.

Damon Moore of WW was EJP's best witness.  He exhibited exactly the business interest EJP's agreement seeks to protect itself against.  Although there was evidence that vendors sell the same products at different prices with different multipliers, Mr. Moore is under the apparently erroneous assumption that vendor pricing is the same for all distributors.  Mr. Ross, as a newly hired WW salesman, could easily explain to Mr. Moore the different pricing mechanisms vendors use, and WW could use this information to disrupt EJP's business relations with its customers.  Further, there was evidence that within days of leaving EJP, Mr. Ross contacted a number of EJP's customers and sold product to DeFelice Company, a customer that Mr. Ross serviced while at EJP.   The evidence establishes that Mr. Ross possessed confidential business information, ranging from customer lists to proprietary business practices, which if

available to a competitor, would likely affect EJP's good will; precisely, the type of information Maine law allows an employer to protect.

Next, he argues the three year term of the agreement is unreasonable.[4]  In *Chapman & Drake,* the Maine Law Court posed the test:  whether the temporal limit is "reasonably related to protecting legitimate business interests of (the employer)."   545 A.2d at 648.   Here, Steven Prescott testified the three year limit was justified for two reasons: 1) product pricing, including EJP multipliers, is generally stable over a three year period; and, 2) based on his experience, it takes between two to four years for a new outside sales representative to get fully acclimated and reach a desired productivity level.   These reasons satisfy the *Chapman & Drake* test.   Finally, even though each analysis is fact-specific, Maine had upheld non-competition agreements of this length and longer.   *See Brignull*, 666 A.2d at 83 (four years); *Chapman & Drake,* 545 A.2d at 647 (five years).[5]

Finally, Mr. Ross argues the agreement was not supported by consideration, since he did not accept the $250 payment offered by EJP.   However, continued "employment itself has been held to be consideration for a non-competition covenant in an employment contract."  *Brignull*, 666 A.2d 82 at 84; *see Wausau Mosinee Paper Corp. v. Magda*, 366 F. Supp. 2d 212, 220 (D. Me. 2005).   The Court finds there was sufficient consideration to support the non-competition agreement.

---

[4] Mr. Ross objected to the geographic reach of the non-competition agreement, but at closing, EJP waived this portion of the agreement.  Under *Brignull,* the agreement must be assessed only as EJP "has sought to apply it and not as it might have been enforced on its terms."  *Brignull,* 666 A.2d at 84.
[5] Although the parties concentrated on the non-competition provision of the agreement, it also contained a non-disclosure provision.  Unlike non-competition agreements, the Maine Supreme Judicial Court has concluded that durational limits are not necessary in non-disclosure agreements.  *Bernier,* 2001 ME 17 at ¶ 18, 77 A.2d at 104.  Thus, even if the Court were to find the durational limit in the non-competition provision unreasonable, Mr. Ross would still be bound by the non-disclosure provisions of the agreement.

In conclusion, the Court finds EJP has exhibited a likelihood of success on the merits that the non-competition and non-disclosure agreement is enforceable, and that Richard Ross breached the agreement.

### C.  Irreparable Harm

EJP claims it will suffer irreparable injury if injunctive relief is not granted.  Among the alleged injuries, EJP asserts its current customers could leave EJP and begin doing business with Mr. Ross's current or future employer.  Further, EJP argues it has a legitimate interest in protecting its longstanding customer contacts, referral sources, and goodwill, and by allowing Mr. Ross to contact EJP customers and directly compete with the company, it will face extreme difficulty in restoring those business connections.  Finally, EJP argues these harms are largely intangible, and cannot be measured in monetary terms.

It is a long standing axiom that "economic harm in and of itself is not sufficient to constitute irreparable injury." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 74-5 (D. Me. 1993) (citations omitted).  Speculative injury "does not constitute a showing of irreparable harm." *Id.  Merrill Lynch* found the plaintiff's claims of loss of good will and future economic injury arising from the defendant's alleged breach of a non-competition agreement were speculative. *Id.*

This case is different.  Mr. Ross admitted to soliciting EJP customers once he started working at WW, and in the brief interval he worked for WW, he already sold to one EJP customer.  There is no need to speculate that the goodwill Mr. Ross nurtured with EJP's customers while he was employed by EJP will lead to ferreting away EJP customers -- it has already happened.  A business's interests in good will, customer contacts, and referral sources "cannot be measured in numerical or monetary terms, and neither can the damages to these

interests that plaintiff will suffer without injunctive relief." *SizeWize Rentals, Inc. v. Mediq/PRN Life Support Servs.,* 87 F. Supp. 2d 1194, 1200 (D. Kan. 2000), *aff'd,* 216 F.3d 1088 (10th Cir. 2000); *see Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir. 1992); *Curtis 1000, Inc. v. Youngblade,* 878 F. Supp. 1224, 1273 (D. Iowa 1995); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (1995).   Further, it would be "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *Ferrero v. Associated Materials Inc.,* 923 F.2d 1441, 1449 (11th Cir. 1991); *Medtronic, Inc. v. Gibbons,* 684 F.2d 565, 569 (8th Cir. 1982); *Spiegel v. City of Houston,* 636 F.2d 997, 1001-02 (5th Cir. Unit A Feb. 1981) (loss of customers and good will gives rise to an irreparable injury).

### D.  Balancing the Equities

This Court must weigh the equities of both parties.  A court must be concerned not only with possible injury to a plaintiff but also with possible injury to the defendant, since the court is "obliged to choose the course likely to cause the least injury."  *Int'l Ass'n of Machinists  & Aerospace Workers v. Northeast Airlines, Inc*., 473 F.2d 549, 553 (1st Cir. 1972).  Proper restrictive covenants cannot preclude former employees from "following any trade or calling for which he is fitted and from which he may earn his livelihood" or "exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment."  *Roy*, 34 A.2d at 481. To be enforceable, the "agreement must impose no undue hardship upon the employee and be no wider in its scope than is reasonably necessary for the protection of the business of the employer." Id. at 480; *Bernier,* 2001 ME 17 at ¶ 17, 770 A.2d at 103.

It is inevitable the enforcement of a non-competition agreement works consequences against the individual that are more human and evocative than the countervailing economic and other consequences against the employer.  *See Wausau Mosinee,* 366 F. Supp. 2d at 223.  That said, Mr. Ross presents a particularly compelling personal case.  He is married and has a young son.  His wife works only part-time, and he has provided a significant portion of household income.  Mr. Ross has multiple sclerosis, a condition that requires significant medical attention and expense, and the enforcement of the agreement will likely affect his ability to procure medical insurance either individually or potentially with a new employer.  He has worked in the pipe and valve industry all his adult life, and if the agreement is enforced, he will be forced to work in a part of the industry that does not compete with EJP, apply his skills to a new field, or move.  These are serious harms.

However, if the personal circumstances of the employee were invariably allowed to trump the economic and other consequences to the employer, non-competition agreements would never be enforceable through injunctive relief.  Here, Mr. Ross bears a substantial degree of responsibility for his misfortune.  After all, he had left EJP to work for WW only a few months previously and as of March 14, 2005, he was not bound by any agreement not to compete with EJP.  On March 14 or March 15, 2005, he could have walked out of Mr. Zanni's office, joined up with WW, and competed with ferocity and impunity against EJP.  Instead, he elected to bind himself to the agreement and shortly thereafter, deliberately to breach it.  Knowing the potential consequences, he rejected all EJP's considerable efforts to retain him.  He seemed obstinately determined to force the legal issue he had created.  *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 815 (1945); *O'Neil v. Picillo,* 682 F. Supp. 706, 727 (D. R.I. 1988) (discussing application of the "clean hands" doctrine).

As tailored by EJP, this agreement hampers, but does not eliminate Mr. Ross's ability to obtain employment.   First, EJP is not attempting to enforce the geographic limitation and, therefore, Mr. Ross can work anywhere so long as he does not violate the other terms of the agreement.   Second, the agreement does not prevent Mr. Ross from using his sales ability and personal qualities in fields other than the pipe and supply business.   Third, the agreement prevents Mr. Ross from working for entities that compete with EJP, but so long as he does not violate the non-disclosure provisions of the contract, he could use his talents and training to work for entities that do not compete with EJP, such as pipe and supply vendors, contractors, or project developers.   Fourth, if Mr. Ross were willing to work in areas of the country where there is no competition with EJP, he is free to do so.

On balance, the equities do not weigh so substantially in Mr. Ross's favor to deny EJP's request for injunctive relief.

### E.  Public Interest

The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief.  *See United States v. Zenon,* 711 F.2d 476 (1st Cir. 1983)(balancing national defense requirements against impact of injunction on fishing and environment).   The Maine Supreme Judicial Court has long since made a public policy decision on this issue by declaring that non-competition and non-disclosure agreements may, in appropriate circumstances, be enforced, a policy decision it has upheld for over one hundred and forty years.  *Bernier,* 2001 ME 17 at ¶ 15, 770 A.2d at 103; *Brignull,* 666 A.2d at 84; *Chapman & Drake,* 545 A.2d at 646-47; *Lord,* 454 A.2d at 834; *Roy,* 34 A.2d at 480; *Warren v. Jones,* 51 Me. 146, 149 (1862). Although covenants not to compete are generally deemed to be against public policy, Maine law

provides they are enforceable, if they are reasonable and sweep no further than necessary to attain their proper objectives. *Lord,* 454 A.2d at 834. As such, this Court cannot conclude public policy considerations exist here that would justify the denial of EJP's request for injunctive relief.[6]

### III.    CONCLUSION

Considering the factors applicable to the extraordinary relief of a preliminary injunction, this Court concludes that EJP has made a compelling showing to warrant the granting of a preliminary injunction in this case. Richard D. Ross is PRELIMINARILY ENJOINED: 1) from continuing in employment with Water Works Supply Corp. or any other business in direct competition with EJP; 2) from contacting, soliciting, or in any way conducting any business with any customers of EJP that were customers of EJP while Ross was employed by EJP; and, 3) from disclosing any proprietary or confidential information, as those terms are defined by the non-competition and non-disclosure Agreement between the parties, at anytime without written authorization from EJP. This Order shall remain in effect for a period not to exceed three years from May 20, 2005, the date Mr. Ross terminated employment with EJP, or until further order of this Court.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of August, 2005

---

[6] Count II of EJP's Complaint alleges a violation of the Maine version of the Uniform Trade Secrets Act (UTSA). 10 M.R.S.A. §§ 1541-48. This Court has rested its decision on Count I, the breach of contract allegation, and it is therefore unnecessary to reach the application of the UTSA to the facts in this case. Furthermore, the parties did not argue the merits of Court II.